John T. PHILLIPS, Jr., Plaintiff,

v.

CROWN CENTRAL PETROLEUM
CORPORATION, Defendant.

Corrado Frank TUMMINELLO,
Plaintiff,

v.

CROWN CENTRAL PETROLEUM
CORPORATION, Defendant.

Charles Phillip FREITAG, Plaintiff,

v.

CROWN CENTRAL PETROLEUM
CORPORATION, Defendant.

Carroll Charles MYERS, Plaintiff,

v.

CROWN CENTRAL PETROLEUM
CORPORATION, Defendant.

Civ. Nos. 73–303–H, 73–304–H, 73–504–H
and 73–506–H.

United States District Court,
D. Maryland.

May 20, 1975.

Robert G. Levy, Peter H. Gunst, George W. Maugans, Allan P. Hillman and Frank, Bernstein, Conaway & Goldman, Baltimore, Md., for plaintiffs.

James H. Kelley, Arthur Wineburg and Bergson, Borkland, Margolis & Adler, Washington, D. C., Morton A. Sacks and Cable, McDaniel, Bowie & Bond, Baltimore, Md., for defendant.

ALEXANDER HARVEY, II, District Judge:

These consolidated cases involve various antitrust claims asserted by four independent gasoline service station dealers against their supplier-landlord. Each of the four plaintiffs operates in the Baltimore metropolitan area, a filling station leased from his supplier, defendant Crown Central Petroleum Corporation (hereinafter "Crown"). Each has filed a separate action in this Court seeking treble damages, attorneys' fees, costs and injunctive relief under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 1, 15 and 26.[1]

In language that is almost identical, the four complaints allege an illegal horizontal conspiracy between Crown and its competitors, an illegal vertical agreement between Crown and each plaintiff and an illegal tying agreement between Crown and each plaintiff. Specifically, it is alleged (1) that in recent years Crown has unlawfully combined and conspired with certain competitors to raise, fix, stabilize and maintain wholesale and retail gasoline prices in the Baltimore metropolitan area; (2) that since plain-

---

1. Represented by the same attorneys, two of the plaintiffs filed suit in April 1973, and the other two filed suit in May 1973. All four cases were consolidated for all purposes, including trial, pursuant to Rule 42(a), F.R.Civ.P.

tiffs have been lessees of their stations, Crown has unlawfully fixed and determined the retail prices for the sale by plaintiffs of gas and oil; (3) that Crown has unlawfully required plaintiffs to purchase motor oils from it; and (4) that Crown has unlawfully restricted plaintiffs as to the types of other products sold at their stations through vending machines or otherwise and as to the sources from which such other products could be purchased.

After each suit was filed, Crown notified each plaintiff that his lease would not be renewed.[2] Plaintiffs thereupon filed a combined motion for a preliminary injunction under § 16 of the Clayton Act, 15 U.S.C. § 26, seeking to enjoin Crown from terminating or not renewing their leases, pending the final determination of these actions. Following extensive discovery, a hearing was held on such motion, and this Court ruled that a preliminary injunction should be entered to prevent irreparable harm to plaintiffs and to maintain the status quo during the pendency of this litigation. Phillips v. Crown Central Petroleum Corporation, 376 F.Supp. 1250 (D.Md.1973). Under the terms of this Court's preliminary injunction of September 20, 1973, plaintiffs have continued to operate their service stations subject to the provisions of Crown's current Lease and Dealer Agreement, under which all of Crown's dealers in Maryland now operate their stations.

Many of the background facts involved in this litigation are set forth in this Court's previous Opinion, which is reported at 376 F.Supp. 1250–1258. However, the only issue involved there was plaintiffs' right to a preliminary injunction and the only claims considered were that plaintiffs were not being renewed because they had refused to comply with illegal directives from Crown to fix their retail prices of gas and oil and because they had insisted on their right to sell products other than those designated by Crown.

Because of the urgent necessity that plaintiffs' right to continue as dealers during the pendency of the litigation be determined at the earliest possible date, the motion was decided without an evidentiary hearing and on the affidavits, exhibits and deposition filed by the parties. In its Opinion, this Court noted that there were numerous conflicts between affidavits submitted by the plaintiffs and those filed on behalf of Crown. 376 F.Supp. at 1254. Findings were made on the basis of the record then before the Court, and the right was reserved to the parties to relitigate fully at trial all the factual issues. As a result of such findings, this Court concluded that plaintiffs at trial would probably be able to establish that their leases were not renewed because they had objected to illegal coercive pressures brought by defendant against each of them. 376 F.Supp. at 1256.

Following extensive additional discovery and pre-trial proceedings, these consolidated cases were tried by this Court sitting without a jury.[3] With the agreement of the parties, the Court ordered a bifurcated trial, with all issues of liability being tried first and all issues of remedy reserved for a later trial if this Court were to find liability.

The trial lasted some four weeks. The numerous witnesses included, of course, the plaintiffs themselves and various officers and representatives of Crown. The testimony was sharply conflicting as to most factual issues. Proposed findings of fact were filed by the parties before the trial and supplementary proposed findings after the trial. In making the detailed findings of fact

---

2. As noted hereinafter, a new lease was tendered to plaintiff Myers and actually signed by him, subject to certain conditions. Crown refused to accept such conditions, and Myers' lease, like the others, was not renewed.

3. Plaintiffs had originally requested a jury but thereafter waived their right to a jury trial.

set forth hereinafter, this Court has generally credited the testimony of the plaintiffs and the witnesses called on their behalf and has therefore accepted many more of plaintiffs' proposed findings than defendant's.[4] The accounts given by the plaintiffs of their dealings with Crown are corroborated by other evidence in the case and in particular by the testimony of witnesses who had no particular stake in the outcome of this litigation.[5] Throughout the lengthy trial, various non-party witnesses called by plaintiffs generally gave a description of Crown's operating methods and relations with its dealers and competitors which was similar to that given by the plaintiffs in their testimony.

## ISSUES

It is agreed that the following issues are presented to the Court in this case:

1. Did Crown violate the antitrust laws by engaging in horizontal price-fixing?

2. Did Crown violate the antitrust laws by engaging in vertical price-fixing?

3. Did Crown violate the antitrust laws by imposing unreasonable restraints on the plaintiffs as to their freedom to purchase and sell motor oils, antifreeze, vending machine items and other products?

4. If the antitrust laws were violated in one more of these respects, did such violation cause Crown not to renew the leases of plaintiffs or did the plaintiffs suffer other injury as a result of such violation?

## FINDINGS OF FACT

### (a) General Findings

1. Crown Central Petroleum Corporation is a Maryland corporation with its principal office in Baltimore, Maryland. Crown operates a refinery located in Houston, Texas and markets gasoline through service stations trading under the Crown name located in fourteen Eastern and Gulf Coast states. In 1972 and 1973, Crown's gross revenues were $183 million and $213 million respectively, while net profits after taxes were $1.3 million and $8.4 million respectively. For the six months ended June 30, 1974, revenues increased 2.2 fold, year to year.

2. Crown is generally referred to in the petroleum industry as an "independent" gasoline marketer, as are other oil companies, including Ashland Oil Company, Hess Oil Company, Petroleum Marketing Corporation (PMC), Meadville Corporation and Hudson Oil Company. PMC operates the "Scot" stations and Meadville operates the "Saveway" stations. Gasoline sold at service stations supplied by the independents is generally sold at prices lower than the prices charged at service stations supplied by the "Major" oil companies, including Exxon, American Oil, Gulf and Citgo.

3. In 1968, Crown altered its method of marketing gasoline in the Maryland market. At this time, Crown began to sell its gasoline through the so-called "multipump" marketing concept. This involved the sale of gasoline and motor oil at discount prices in modern, well-lighted, clean and uncluttered service stations featuring fast, efficient service by neatly-groomed attendants. Before 1968, Crown had itself owned and operated its service stations in the Baltimore area. In changing its method of operation, Crown felt that an independent dealer would be better able than a company employee to maintain supervisory control over the station's attendants and facility and that this would serve to enhance Crown's image of clean appearance and fast service. Through its mul-

---

4. Some proposed findings of both plaintiffs and defendant were rejected by the Court because they were not supported by the credible evidence. Others were not accepted because they were not pertinent to a resolution of the legal issues presented or because they were duplicative of other findings.

5. Included among these were the witnesses Knox, O'Hara, Kling, Horner and Mech.

tipump outlets, Crown has continually increased its share of the Maryland gasoline market. In 1968, Crown's total sales of gasoline in Maryland amounted to less than 2% of the market. For the year 1972, it had raised its share to 4%.

4. By 1973, in the Maryland market, Crown was the largest of the independent gasoline marketers and its 5% share of gallonage sales was the fifth largest market share of all gasoline marketers, including the "major" oil companies. By that date, it was surpassed, insofar as its share of the market was concerned, only by Exxon, American Oil, Shell and Gulf.

5. The independent dealers would lease their stations from Crown, purchase petroleum products from Crown and hire and maintain their own attendants.

6. Each Crown dealer would execute a lease, a dealer contract and an Equipment Loan Agreement. Prior to 1973, each of these instruments was for terms of one year and renewed itself for successive one-year terms, if not terminated. The contracts and leases were cancellable on five days' notice.

7. Since July 1, 1973, when the Maryland Gasoline Product Marketing Act went into effect, Crown and its dealers, other than plaintiffs, have entered into new contracts with terms ranging up to three years.

8. Crown has found that its dealers have, for the most part, maintained clean, attractive stations and provided fast, efficient service. Sales at Crown's multipump stations have continued to grow under dealer operation, with the result that Crown's sales, profits and share of the Maryland market have increased. At the same time, such operation of multipump stations has proved to be profitable for the dealers.

9. Each plaintiff is an independent Crown service station dealer and has operated his Crown service station pursuant to leases and contracts with Crown. Plaintiff Phillips operated a Crown service station located at Garrison and Wabash Avenues in Baltimore City during the period December 21, 1970 until January 1971. Since January 25, 1971, Phillips has operated the Crown service station located at Ritchie Highway and Old Annapolis Road. Plaintiff Tumminello has operated the Crown service station located at 5838 Belair Road since March 1969. During the period 1964 until March 1969, Tumminello was employed by Crown first as a Sales Representative and then as a Sales Supervisor. Plaintiff Freitag has operated the Crown service station located at Harford Road and Northern Parkway since November 25, 1970. Plaintiff Myers has operated the Crown service station located at Quarterfield and Old Stage Roads since August 18, 1970.

10. Each plaintiff originally operated under a renewable one-year lease and contract. Plaintiff Phillips was offered and accepted a six-month lease and contract in December 1972. He filed his suit in this Court on April 3, 1973. He was notified on May 11, 1973 that his lease and contract would be allowed to expire. Plaintiff Tumminello was offered and accepted a six-month lease and contract in February 1973. He filed his suit in this Court on April 3, 1973. He was notified on May 11, 1973 that his lease and contract would be allowed to expire. Plaintiff Freitag filed his suit in this Court on May 18, 1973. By letter dated August 2, 1973, Freitag was notified by Crown that it would not enter into a new lease and contract with him upon the expiration of his present lease and contract on November 25, 1973. The lease and contract of plaintiff Myers were successively renewed for one-year terms in August 1971 and August 1972.

11. After he filed suit on May 18, 1973, plaintiff Myers was offered a Branded Service Station Lease and Dealer Agreement by Crown of the type under which all present Maryland Crown dealers now operate. Myers executed the Lease and returned it to Crown.

However, because he believed certain provisions of the lease were illegal, he reserved the right to challenge in this suit the legality of the new lease. For this reason, Crown refused to accept the Lease and Agreement which had been signed by Myers.

12. During the time that plaintiffs have operated their Crown service stations, each plaintiff has devoted substantial efforts and has invested substantial amounts of time and money to promote the sale of gasoline, motor oils and other products at his station. As a result of the efforts of each plaintiff, each has substantially improved the gallonage sales at his service station. Plaintiffs Tumminello and Freitag have received awards and commendations for the attractive appearance of their stations. Gasoline sales at both Freitag's and Phillips' service stations have been above the average of all Crown dealers in the Baltimore market, and Tumminello's sales have been only slightly below those of the average Crown dealer. Myers' sales have also been satisfactory.

13. Plaintiffs' satisfactory performance as Crown service station dealers has previously been recognized by Crown.

(b) *Findings Concerning Horizontal Price-Fixing*

14. Beginning at least as early as 1968, Crown has combined with competing independent suppliers, including, among others, PMC, Hess, Ashland and Meadville, to artificially maintain retail gasoline prices in the Baltimore metropolitan area. Crown has conspired with the above-named suppliers, among others, in the Baltimore metropolitan area, both to eliminate retail price disturbances which threatened to become major price wars, and to initiate joint retail price increases.

15. On the morning of January 26, 1972, Crown District Manager Jack Conway and Crown Sales Representative Michael Corbett visited Crown dealer John Gibson at his service station located at 2650 Patapsco Avenue and discussed with him low retail prices charged by a competing Scot station operated by PMC located at Patapsco Avenue and Potee Street. Conway made a long distance telephone call from Gibson's service station and dialed 202–223–5440, the telephone number of PMC. Conway identified to PMC Retail Sales Manager and Vice President Henry Wainwright the competing Scot service station and complained that it was posting a low retail price. Later that same day, PMC increased the retail price charged at the Scot service station which was then competing with Gibson's Crown station. On other occasions, Conway contacted a representative of PMC for the purpose of effecting joint retail price increases.

16. Similarly, PMC initiated telephone communications with Crown in order to effectuate joint retail price increases at competing Crown and PMC supplied Scot service stations. Joseph Gilboy, Crown District Manager, received repeated requests from representatives of PMC, including Wainwright, to increase retail prices charged at Crown service stations.

17. On various occasions, Gilboy received telephone calls from representatives of PMC informing him that PMC was going to institute retail gasoline price changes at particular Scot stations. On these occasions, Gilboy was given advance notice of future retail price moves by Scot stations, before these price changes were made known to the public.

18. Since 1970, Wilbur G. Pressler, Crown's Manager of Administration, Marketing Department, has repeatedly communicated by telephone with representatives of other independent suppliers, including Irving Grossman of Hess, Joe Davis of Ashland and Joseph Jerome of Meadville, in order to eliminate retail price disturbances within the Baltimore market. Pressler repeatedly telephoned Irving Grossman, who handled the pricing for Hess in Baltimore, to complain about Hess branded service stations which posted lower retail prices

in the Baltimore metropolitan area than competing Crown stations. On one occasion, when Grossman attempted to justify a low retail price charged by a Hess service station located on Ritchie Highway by identifying a competing Peco independent service station which was also charging the same price, Pressler told Grossman that the actions of the Peco service station did not justify Hess' low retail price and that Grossman was really reaching out for a reason for a lower price. In the Patapsco Avenue area, a Crown station competed with stations of Midway, Hess and Ashland. Retail prices had been stabilized in that area shortly before January 1973, when the price structure was endangered by a double stamp promotion at the Saveway service station. The Ashland-supplied Bi-Lo service station in the area retaliated by lowering its retail price. Other independent gasoline marketers, including Crown and Hess, were well aware of the importance of ending the price war on Patapsco Avenue. They feared that major oil companies which supplied stations located in the Patapsco Avenue area would react to the price disturbance by instituting voluntary allowances to their services stations which were losing volume to the discounting independents. If the major oil companies granted such voluntary allowances, such allowances would be in effect over a much larger portion of the Baltimore area and would depress retail prices charged at independent service stations throughout the broad geographic area of the Baltimore market. Crown Vice President Jack Loving instructed Wilbur Pressler, Crown's Manager of Administration, Marketing Department, to telephone Ashland's Vice President Joe Davis, to complain that the Bi-Lo service station was charging low retail prices and thereby threatening the stabilization of retail prices in the Patapsco area. Davis told Pressler that the price reduction at the Bi-Lo station was occasioned by Saveway's glasses or stamp promotion at its Patapsco Avenue station. Pressler also related Crown's complaint concerning Saveway's promotion to Joseph Jerome, Vice President of Meadville, by telephoning Jerome at his office in New Jersey. Pressler told Jerome that he had just spoken with Ashland and further informed him of Ashland's claim that Saveway had precipitated the price disturbance by its promotion at its Patapsco Avenue service station. Pressler felt that a continuation of the price cutting would hurt the entire market, and his intent in making these calls was to eliminate the price competition in the area of western Baltimore.

19. A dealer-operated Crown service station is located near the intersection of York Road and Padonia Road in Timonium, Maryland. This station competed with nearby Hess, Phillips and Scot service stations. Sometime in 1971, in an effort to stabilize retail prices in the area which was then experiencing a price war, some one from Crown's marketing department telephoned the office of Phillips Petroleum in Maplewood, New Jersey for the purpose of causing the competing Phillips station to raise its retail prices. However, Crown was unable to induce Phillips Petroleum to participate in curing this price depression. It was reported to Crown's Vice President of Sales, J. I. Loving, that the telephone call to Phillips had yielded: "No action. No results. No action."

20. From April 1969 until August 1971, Howard E. Knox was Administrative Aide and Secretary to Theodore Ferguson and Henry Wainwright, officers of PMC. Throughout the term of Knox's employment, PMC engaged in constant communication with its competitors, including Crown, Saveway and others, for the purpose of fixing retail gasoline prices. On orders from Wainwright and Ferguson, Knox personally spoke with Crown District Managers Joseph Gilboy and John Conway. During these conversations, Knox would tell Gilboy and Conway that PMC intended to either raise or lower its prices at a given time and date and in a certain distribut-

ing area. Knox would ask if Gilboy or Conway would agree to go along with PMC on its price rise or decrease, as the case might be. In each case that Knox could recall, either Gilboy or Conway called back and told Knox that they agreed. Knox had similar discussions with Mort Sands of Meadville and with representatives of other competing companies, in which he would advise these competitors of an impending Scot price change and would receive assurances that their competing service stations would institute similar price changes. Knox was also instructed to place telephone calls for his superiors. Although Knox did not participate in these conversations, their substance was the same as the calls described as having been made by Knox himself. Because his desk was located close to Ferguson's, Knox was able to frequently overhear Ferguson's conversation with competing gasoline suppliers.

21. While Henry Wainwright was Retail Sales Manager and Vice President of retail marketing for PMC from 1970 to date, he had repeated telephone conversations with representatives of Meadville, Hess and Crown for the purpose of discussing retail prices throughout PMC's marketing area.

22. Since at least as early as 1964 and continuing through 1973, independent gasoline suppliers in the Maryland marketing area have used an industry organization, the Society of Independent Gasoline Marketers of America (SIGMA), as a vehicle to fix and stabilize retail prices charged at independent service stations. SIGMA executives repeatedly telephoned representatives of Crown, PMC and Hess to inform them that certain competing oil companies intended to increase retail prices by a certain amount at a certain time. Pressler of Crown received telephone calls from SIGMA executives Howard Teak and Richard Reynolds, during which they gave him advance notice that particular competitors intended to effectuate price changes. Following such a communication, Crown would increase the retail

prices charged at service stations which it supplied.

23. In addition to coordinating retail gasoline price increases among the independent gasoline marketers, including Crown, SIGMA was also utilized to cure smaller pockets of depressed retail pricing. Irving Grossman of Hess utilized SIGMA as an intermediary to complain to his competitors concerning low retail prices which they charged at their service stations. On one occasion, Howard Teak at SIGMA relayed to Mary and Robert Hudson, principals of Hudson Oil Company, at Grossman's request, his complaint that Hudson wanted to destroy local markets by discount pricing. Unlike Crown, PMC, Hess and other independent gasoline marketers in the Maryland area, Hudson refused to participate in efforts of its competitors to cure retail price disturbances, but instead avoided, on most occasions, discussions with SIGMA and its competitors.

24. Beginning at least as early as the spring of 1969 and continuing until at least as late as the summer of 1971, Ferguson and Knox of PMC received various telephone calls from Teak. On occasion, Teak would inform Knox that the major oil companies were "going up" by one or two cents within one or two days. Upon being informed of SIGMA's message, Ferguson would instruct Knox to increase the retail prices charged by PMC's Scot branded service stations by a like amount. In addition, Ferguson would either instruct Knox to telephone the other independent suppliers or would himself telephone them, so that they might increase the retail prices charged at the service stations which they supplied by a like amount at the same time. Among the individuals so contacted by Ferguson or Knox were representatives of Crown, Meadville, Hess and others.

25. During his employment with Crown from 1964 until 1969, plaintiff Tumminello learned that Crown had agreements with other oil companies through which Crown could effectuate joint retail price increases within the

Baltimore market. Gilboy informed Tumminello that he had succeeded in increasing retail prices charged by a competitive Field service station in York, Pennsylvania. On several occasions, Crown District Manager Clark Corcoran instructed Tumminello to observe a Scot station on York Road in Baltimore to confirm an increase in its retail prices which would occur at 3:00 P.M. on that afternoon. On each occasion, Tumminello reported to Corcoran that the Scot service station had increased its price as Corcoran had said it would. On occasion, Corcoran assigned Tumminello to observe price changes at a Saveway service station located on Pulaski Highway. In each instance, Tumminello confirmed to Corcoran that the Saveway station had actually changed its retail price as predicted.

26. On November 24, 1970, after becoming an independent dealer, Tumminello was telephoned by Crown office manager Chris Blackman, who instructed him to increase the retail price which he charged for gasoline by one cent per gallon. Blackman told Tumminello that an agreement had been reached among Crown, PMC, Hess and others to increase the retail gasoline price in Tumminello's marketing area by one cent per gallon at 3:00 P.M. that afternoon. Tumminello telephoned plaintiff Freitag, who at that time managed the company-operated Harford Road Crown service station. Freitag informed Tumminello that he had been instructed by Conway to increase the retail prices charged by the Harford Road Crown station at 3:00 P.M.

27. On at least one occasion, Margaret E. Kling, who was the independent operator of the Crown service station in York, Pennsylvania, from mid-1970 until early 1972, was instructed by Crown representative Donald Head to increase her retail gasoline prices. When Mrs. Kling objected to this increase, Head assured her that competing independent gasoline service stations in the area would be similarly increasing their prices.

28. On other occasions throughout the period during which Tumminello has been a Crown dealer, he has been instructed by Crown representatives that he must increase the retail prices charged at his service station to effectuate agreements reached among Crown and other independent suppliers. In February 1973, Blackman telephoned Tumminello and ordered him to increase his retail gasoline price because an arrangement had been made with competitors for a joint retail price increase. In August 1972, while Tumminello was vacationing in Wildwood, New Jersey, Head instructed Tumminello's attendant, Allen Mech, to increase the retail gasoline prices charged Tumminello's service station. Mech protested that he could not increase retail prices without Tumminello's permission and later that day telephoned Tumminello in Wildwood, New Jersey, to report Head's instruction. Tumminello instructed Mech not to change the retail prices until he returned. The next day, Tumminello learned from Mech that Head had returned to the station and physically changed the retail prices posted at Tumminello's station. When Tumminello telephoned Blackman to complain concerning the price increases, Blackman informed him that various competitors had agreed with Crown to increase the retail price of gasoline, and that the price increase had been in accordance with that agreement.

29. From 1964 until 1973, Irving R. Grossman was marketing coordinator for Hess and was responsible for its pricing throughout Hess' marketing area. Throughout that period, Grossman repeatedly received telephone calls from representatives of various independent suppliers, including Pressler and Garrison of Crown, Ferguson and Curlett of PMC, Mort Sands and Joseph Jerome of Meadville, and Gene Hays and Jack Allard of Ashland, among others, concerning retail price disturbances.

Typically, his callers, including Pressler, Cahir and Garrison, would identify by location particular Hess service stations which were posting retail prices lower than those charged by service stations supplied by the caller's company. The purpose of these repeated telephone conversations between Crown and Hess was to minimize price competition between Crown and its competitors. Grossman knew that information was being supplied to him by Crown and other competitors so that Hess would not act unilaterally to lower its retail prices. Grossman also received calls from representatives of Crown and other competitors, informing him in advance of retail price increases which would occur at a specific time. Such increases might relate to service stations which were identified or to broader geographic areas in and around Baltimore.

30. Throughout the period 1964 until 1973, Grossman repeatedly received telephone calls from representatives of SIGMA, including Teak, Teak's successor, Cavin, and Teak's assistant, Reynolds, concerning retail price increases involving Crown and the other independent suppliers in the Baltimore market. Grossman continued to receive telephone calls from Crown and other independent suppliers and from SIGMA concerning retail price increases until he ceased his employment with Hess in 1973.

31. Donald F. Sheneman has been Mid-Atlantic District Manager for Petroleum Marketing Corporation since March 1972. Throughout that period, Sheneman repeatedly initiated and received telephone calls from representatives of various competing independent suppliers, including Conway, Sterner and others of Crown, Brown of Bi-Lo, Grossman of Hess and Clayton of Meadville, for the purpose of effecting retail price increases and to cure retail price disturbances in the Maryland market. Sheneman had similar conversations with Richard Reynolds of SIGMA.

32. Effectuation of its agreements with other independent suppliers for joint retail price increases for the elimination of pricing conditions which threatened to become major price disturbances required that Crown control the prices at which its dealers, including plaintiffs, sold gasoline at retail to the public. Through such agreements and its policy of fixing its dealers' retail prices, Crown and such other independent suppliers of gasoline have been largely successful in maintaining retail gasoline prices charged by independently supplied service stations at artificially maintained levels. Since as early as March 1970, Maryland has been free of extensive price war conditions. Crown's acts have contributed to the artificial stabilization of the Maryland market.

(c) *Findings Concerning Vertical Price-Fixing*

33. From the time of the inception of Crown's dealer operated multipump service station program, it has been Crown's intention to control the retail gasoline prices charged by independent multipump service station operators.

34. Mr. J. I. Loving, Vice President of Sales of Crown, transmitted a memorandum dated October 9, 1968 to Mr. T. H. Cahir, one of Crown's Regional Managers, which outlined the various conditions and operating procedures under which Crown's independent multipump service station dealers would operate. One of the conditions set forth in the memorandum was that the retail gasoline prices charged at the station in question would be at Crown's discretion.

35. The memorandum of October 9, 1968 provided in pertinent part as follows:

"Confirming our understanding with respect to the above, it will be satisfactory to conclude an agreement with Mr. Bell [a new Crown dealer] along the following lines:

"(1) Gross gasoline margins of 4.-75¢ and 5.25¢ housebrand and premium, respectively. Margins on both grades to escalate up and down ¼¢ per gallon with each 1¢ on the pump

(base posting = 29.9¢ and 33.9¢). This does not apply to postings increased due to a tax increase. Minimum margin will be 3.75¢ and 4.25¢. Above understanding to be verbal. Pump postings at Crown's discretion."

36. Before becoming an independent Crown service station dealer, plaintiff Tumminello was employed by Crown as a Sales Representative, and subsequently as a Sales Supervisor. During the period from late 1968 through early 1969, Tumminello was instructed by Crown to explain Crown's operating procedures to the new independent Crown multipump dealers. Tumminello had seen a copy of Loving's memorandum of October 9, 1968. In accordance with instructions from Crown, Tumminello explained to new Crown multipump dealers Donald Bell and William O'Hara that Crown alone would set the retail gasoline prices charged at their respective service stations.

37. On or about May 27, 1969, shortly before he commenced the operation of his station, independent Crown service station dealer John G. Brenner met with Crown Sales Representative George Bamford, and Bamford discussed with him the contents of Loving's memorandum.

38. Crown's method of computing the wholesale price at which its independent dealers purchase gasoline from it differs from the method employed by major gasoline marketers. Major oil companies customarily charge their dealers a predetermined wholesale price, commonly referred to in the industry as a "dealer tankwagon price". When competitive conditions require that the wholesale price to the dealer be lowered, the dealer is granted a discount from the dealer tankwagon price, commonly referred to as a "voluntary allowance". Crown, however, determines the price which it charges its dealers for gasoline by deducting a predetermined margin from the actual retail price to be posted by the dealer.

39. Crown's marketing philosophy is based on the belief that it is economically imperative that Crown dealers post retail prices within approximately two cents of the retail prices posted by Crown's major brand competitors. It is believed that if a Crown dealer were to post a retail price lower than two cents below the major brand competition, the majors might react by lowering their own prices to meet this competition. In such event, other independent competitors of Crown such as PMC, Hess and Meadville might also react by lowering their prices as well, thus precipitating a price war. If a dealer were to raise his prices to a level above the accepted differential, his gallonage sales, and thus Crown's sales, might decrease.

40. In addition, Crown wished to control its dealer retail pricing in order to implement the terms of agreements made between Crown and other competing gasoline marketers to institute similar retail gasoline price increases at designated times.

41. Internal memoranda of Crown indicate that Crown, on various occasions, required its independent dealers to change their retail gasoline prices at times and by amounts dictated by Crown.

42. Until mid-1973, when Crown revised the form of its leases and dealer contracts, the written instruments under which all independent Crown service station dealers leased their stations from Crown contained a five-day cancellation clause. This clause provided that Crown could terminate the dealer's lease for any reason upon five days' notice to the dealer.

43. Crown was well aware of the effect that the five-day cancellation provision of its leases had upon its dealers and used the cancellation provision to obtain compliance with its pricing policies, including its requirement that Crown alone determine dealer retail gasoline pricing.

44. During the time that plaintiff Tumminello has operated his Crown

service station, various Crown representatives have instructed him to raise or to lower his retail gasoline prices to specified levels at specified times. Crown representatives, including Sales Representatives Donald Head and Michael Corbett, and District Managers Edward Gillespie, John Conway and Clark Corcoran, have instructed Tumminello that he could not independently raise or lower his retail gasoline prices without first obtaining permission from Crown. When he objected to Crown's retail pricing directives, Tumminello was threatened with cancellation or non-renewal of his service station lease. In addition, Tumminello was informed by Crown, at the time of various retail price changes, that other competing gasoline marketers had agreed with Crown to institute similar retail gasoline price changes at service stations which they supplied.

45. In November 1970, Chris Blackman, Crown's Regional Office Manager, instructed plaintiff Tumminello to increase his retail gasoline prices by one cent at 3:00 P.M. that day. Blackman told Tumminello that other competitors had also agreed to raise their retail gasoline prices by one cent at 3:00 P.M. However, plaintiff Tumminello did not change his prices as he was instructed to do by Blackman. Subsequently, Tumminello received a telephone call from Crown District Manager Conway, who told him to increase his retail prices in accordance with Crown's instructions. Conway reiterated that arrangements had been made with other oil companies to effect a uniform price increase. The next day, Tumminello changed his retail gasoline prices as directed to do by Crown for fear of losing his station.

46. In April 1971, plaintiff Tumminello decided to independently lower his retail gasoline prices, without a corresponding reduction in Crown's wholesale price, in order to better compete with a nearby competing Esso service station. This Esso service station had been posting retail gasoline prices lower than those posted by Tumminello. Shortly after Tumminello altered his prices, a Crown sales representative visited his station and told him that he could not lower his prices without Crown's approval. After such sales representative left his station, Tumminello received a telephone call from District Manager Conway who instructed him to raise his retail gasoline prices to their previous level immediately or his lease would be cancelled on five days' notice. For fear of losing his station, Tumminello increased his prices to their prior level at 3:00 P.M. that day. The competing Esso service station continued to post retail gasoline prices lower than those posted by Tumminello until at least September 1971, causing a substantial loss of gasoline sales at his station.

47. On one occasion in 1972, a Crown sales representative physically changed the prices posted on Tumminello's gasoline pumps. In August 1972, while Tumminello was away from his station, Crown Sales Representative Donald Head visited the station and told the shift manager, Allen Mech, that the retail prices were going up and to contact plaintiff. Shortly thereafter, Mech telephoned Tumminello and was told not to change the retail prices at that time. Later that evening, Head returned to the station. Mech told Head that Tumminello intended to wait until the next day to raise his prices. Head instructed Mech that everyone was going up and that the prices at Tumminello's station were going to be increased. Head then proceeded to change the pricing mechanism in the gasoline pumps himself while Mech changed the price sign.

48. On February 20, 1973, plaintiff Tumminello received a telephone call from Blackman, who instructed him to raise his retail gasoline prices by one cent because competitors were going to institute similar price increases. Tumminello then spoke to Crown District Manager Edward Gillespie, who confirmed Blackman's statement concerning the intentions of competing gasoline

marketers. However, Tumminello did not change his prices in accordance with Crown's instructions at that time. Shortly thereafter, Sales Representative Donald Head visited Tumminello's station and when told that the instruction had been received from Crown to increase the prices, asked him why his prices had not increased. Tumminello told Head that if he increased his prices, he would be posting prices higher than his competition. Head then told Tumminello that his lease was coming up for renewal soon and that if Tumminello did not change the price, he (Head) would have to report it. At 3:00 P.M. the next day, Tumminello raised his prices in accordance with Crown's direction.

49. In early 1973, Tumminello was called to a meeting with Crown District Manager Edward Gillespie and Sales Representative Donald Head at the Friendship Inn. During the meeting, Gillespie told Tumminello that Crown would not renew his existing lease, but would instead give him a lease for only six months' duration because Tumminello had been a "troublemaker" by not following Crown's pricing policies and by objecting to other Crown policies. Gillespie stated that the basic reason for the six-month lease was because Tumminello always fought Crown on pricing. When Tumminello explained that he had resisted Crown's pricing directives only because they put him in an uncompetitive position, Gillespie told him that if Crown told him to raise his prices, he must do so. Gillespie assured him, however, that if he went along with all of Crown's policies and did not argue about changing prices when Crown instructed him to do so, his lease would be extended for another year at the expiration of this six-month term.

50. During the the time that plaintiff Phillips has operated his Crown service station, Crown representatives have instructed him when to raise and when to lower the retail gasoline prices posted at his station. Phillips was aware that if he did not obey these instructions, his service station lease might be cancelled on five days' notice or might not be renewed. On several occasions when Phillips was instructed to change his prices by Crown, he was also informed that competing service stations would be instituting similar price changes.

51. On May 17, 1971, Crown District Manager John Conway telephoned Phillips and ordered him to lower his retail gasoline prices by one cent, effective at 3:00 P.M. that day. In an effort to delay reducing his price, Phillips told Conway that he did not know how to change the pricing mechanism. Conway told Phillips that if he was going to remain a Crown dealer, he would have to learn to change his retail gasoline prices when Crown told him to change them. Phillips changed his prices as instructed.

52. On one occasion during the summer of 1971, Crown Sales Representative John Nugent visited Phillips' station and told the attendant that Crown had decided to raise the retail price of gas. Nugent told the attendant that a competing service station would be similarly increasing its prices. Plaintiff increased his retail gasoline prices as instructed by Crown. However, his competition did not increase his prices. Plaintiff complained to Conway and asked for permission to lower his prices, which was later given to him. Plaintiff then lowered his prices.

53. As a result of his resistance to Crown's pricing directives and other restrictive marketing policies, plaintiff Phillips, like plaintiff Tumminello, was called to a meeting attended by Sales Representative Head and District Manager Gillespie. This meeting, held on December 19, 1972, was convened only five days after Crown had discovered plaintiff Phillips selling Quaker State motor oil out of his back room. During the meeting, Gillespie informed Phillips that his present service station lease was being cancelled and that he was being given a "probationary" lease of only six months' duration. Gillespie also in-

formed Phillips during the meeting that a Crown dealer in Rockville was going to be terminated because he did not set retail prices at levels specified by Crown.

54. During the time that he has been a Crown service station dealer, plaintiff Freitag has been similarly instructed by various Crown representatives to raise or to lower his retail gasoline prices. On several occasions, plaintiff was told by Crown that efforts were being made to effect similar price changes at competing service stations. Crown representatives also instructed Freitag that unless he posted the retail gasoline prices dictated to him by Crown, his service station lease would be terminated or would not be renewed.

55. At the time that Freitag commenced the operation of his station, nearby competing Fisca and Red Head service stations were posting retail gasoline prices equal to those posted by him. However, by the end of January 1971, those stations had lowered their prices two cents below Freitag's prices. Throughout the period from mid-January until May or June of 1971, Freitag continually requested permission from his Crown Sales Representatives and District Manager Conway to lower his retail prices to meet his competition, even though Freitag did not expect Crown to lower its wholesale price to him. On each occasion permission was refused. In response to several of these requests, Conway told Freitag that he had been in contact with the suppliers of the competing Fisca and Red Head stations in an effort to cause those stations to raise their retail gasoline prices.

56. In July 1971, Freitag was instructed by a Crown employee to raise his retail gasoline prices by three cents. When he objected, Freitag was told that competing Red Head and Fisca service stations in his area were also going to increase their retail gasoline prices by the same amount. Freitag did raise his prices as he was instructed to do by Crown and subsequently noticed that the nearby Fisca and Red Head service stations did increase their prices as Crown had indicated they would.

57. On October 25, 1972, Freitag unilaterally raised his retail gasoline prices by two cents, even though he had not obtained prior permission from Crown. That night, Sales Representative Head observed Freitag's unilateral price increase and telephoned District Manager Gillespie at some time after midnight to inform him of Freitag's price move. The next day, Head visited plaintiff's station and told him that Crown management was disturbed about the price increase. Shortly after this conversation, Freitag reduced his prices.

58. Crown has imposed the same pricing restrictions upon plaintiff Myers as have been imposed upon the other plaintiffs. During the time that Myers has operated his Crown service station, various Crown representatives have instructed him to raise or lower his retail gasoline prices. It has been made clear to Myers that unless he followed Crown's policies, including pricing, he would lose his service station. He has also been instructed by Crown that he is not permitted to independently change his retail gasoline prices without first obtaining permission from Crown.

59. In late July 1971, Crown instructed plaintiff Myers to increase his retail gasoline prices by two cents. Myers raised his price in accordance with Crown's instructions, but then observed that his retail gasoline prices were higher than those posted by a nearby Crown service station operated by plaintiff Phillips. Following this price increase, Myers noticed that his gallonage sales were decreasing. He also found that many of his customers were complaining about the higher prices and were indicating that they would, in the future, purchase gasoline from plaintiff Phillips. Myers then telephoned Crown District Manager John Conway, informed him of his decreasing gallonage and customer dissatisfaction and requested permission to lower his

retail gasoline prices. Permission was refused.

60. In July 1972, Myers was instructed by Crown to raise his retail gasoline prices by one cent, which he did immediately.

61. On August 10, 1972, Crown Sales Representative Michael Corbett telephoned Myers at his home in the evening and informed him that Crown's wholesale gasoline price would be increased by three-quarters of a cent and asked whether Myers had the proper numerals to post on his large price sign to reflect his new retail gasoline prices. Corbett also indicated that the price increase would include other oil companies. The next day, Crown Office Manager Chris Blackman reiterated Corbett's pricing instructions to Myers. However, Myers did not increase his prices at that time. Later in the day, Myers complained to Crown Manager of Administration, W. G. Pressler, about the fact that his competitors had not increased their prices, but was told again that the price increase would include other oil companies. In order to offset his loss of gallonage resulting from the price increase, Myers raised his retail price for Crown regular gasoline by two cents, thus increasing his margin of profit. The next day, Sales Representative Corbett visited Myers' station and asked him why he was posting a retail gasoline price one cent above Crown's "suggested" price. Later, he received a telephone call from Blackman, who stated that he thought Myers did not understand Crown's pricing program. Blackman explained that Crown was "suggesting" a price one cent lower than that actually posted by Myers. On August 14, 1972, Myers met with Phillip Sterner, Crown Regional Manager. During the meeting, Sterner suggested to Myers that he lower his price to conform to Crown's suggested price and state that if he did not do so, Crown management would think him to be a "wise guy". The next day, Sterner visited Myers' station and after observing that Myers had not changed his price, told Myers that he thought he had agreed to lower his price to the level suggested by Crown. Shortly after Sterner's visit, Myers lowered his price.

62. Other present and former independent Crown service station dealers have been subjected to the same pricing restrictions as have been imposed upon plaintiffs. Crown has required that these present and former dealers post only the retail gasoline prices authorized by Crown and has made clear to each of these dealers that deviation from Crown's pricing policies would jeopardize their continued occupancy of their stations.

63. David Horner was the independent operator of the Crown service station located at 6315 Reisterstown Road from September 1970 until late April 1974. Ever since he became a Crown service station dealer, Horner was instructed by Crown when to raise and when to lower his retail gasoline prices. He understood that he was required by Crown to change his prices as he was instructed to do. With one exception, Horner always followed Crown's pricing directives.

64. On August 23, 1973, Horner received a telephone call from Crown Sales Representative Sylvester Bollinger, who recommended that Horner reduce his retail gasoline prices because Crown was going to reduce its wholesale price at that time. However, Horner decided to leave his retail prices at their existing levels and thereby enjoy a greater margin of profit. On August 24, a Crown employee telephoned one of Horner's employees to determine his retail gasoline price postings. Later that day, Horner received a telephone call from Crown District Manager Edward Gillespie, who asked him to lower his price. Horner told Gillespie he intended to leave his prices at their prior levels over the weekend in order to obtain a greater margin of profit but would consider reducing his prices following the weekend. Gillespie then reiterated his request that

Horner lower his prices. On August 25, Horner was visited at his station by the President of Crown, Henry Rosenberg, who asked Horner, "What's with the price?" After Horner explained his reasons for not reducing his prices to levels suggested by Crown, Rosenberg told him that he had been away from the station a lot lately. That night, Horner's station was inspected by Crown Sales Representative Lee DelPrete. Horner received the first unsatisfactory inspection report which he had ever received since becoming a Crown dealer. Horner lowered his prices to levels recommended by Crown the following Monday morning.

65. William J. O'Hara has been the independent operator of the Crown service station located at 10615 Reisterstown Road, Owings Mills, Maryland, continuously since December 8, 1968. During the time that he has operated his service station, he was instructed when to raise and when to lower his retail gasoline prices. He was told that Crown alone would determine his retail posting, and because of threats which he received from Crown, O'Hara refrained from posting retail prices other than those dictated by Crown.

66. Shortly before commencing the operation of his service station, O'Hara attended a meeting at the Crown district office on Pennington Avenue, Baltimore, Maryland. During this meeting, Crown Regional Manager Thomas Cahir, District Manager Clarke Corcoran and Sales Representative Tumminello informed O'Hara that Crown would set and control the retail price of gasoline sold at his station.

67. In the spring of 1970, O'Hara was told by a representative of Crown to raise his retail gasoline prices by one cent. O'Hara objected to this increase, claiming that he would lose business to a competing Hess station. He was told that Crown had already talked Hess into going up. O'Hara did as instructed, but during the following months observed that his station was losing gallonage to the competing Hess service station which posted lower prices than O'Hara's. During this time, O'Hara was visited by Crown's President, Henry Rosenberg. O'Hara complained to Rosenberg of his loss of gallonage and was told that Crown was working on the situation.

68. In July 1971, District Manager Conway telephoned O'Hara and instructed him to increase his retail gasoline prices by two cents at 3:00 P.M. that day. O'Hara objected, telling Conway that such an increase would make him two cents higher than a competing Hess station. Conway told him not to worry because Crown had already talked to Hess and they were going to go up, too. O'Hara increased his price as instructed at the appointed time, but Hess did not change. Later that night, Sales Representative Donald Head telephoned O'Hara and instructed him to drop his retail gasoline prices by one cent immediately. O'Hara again changed his prices as instructed by Crown.

69. In August 1973, Crown Sales Representative Lee DelPrete telephoned O'Hara and told him that Crown was going to reduce its wholesale gasoline price by three-quarters of a cent and suggested that O'Hara reduce his retail gasoline price by one cent. O'Hara objected to this price change, and told DelPrete that he would not change his prices without doing some checking. At 11:30 that night, DelPrete again telephoned O'Hara and asked if he had changed his mind about lowering his prices. Again, O'Hara told DelPrete that he would not lower his price. DelPrete informed O'Hara that he would submit to Crown a report containing the names of all of those Crown dealers who did not move their prices. The, next day, Crown District Manager Edward Gillespie telephoned O'Hara and asked why he would not lower his price in accordance with Crown's instructions. A heated argument ensued, during which Gillespie cursed at O'Hara and told him to do what he wanted but that his (Gillespie's) day would come. The following

day, O'Hara received an unacceptable service station inspection report, one of only a few such unacceptable reports that he had received in six years. O'Hara then lowered his price to that suggested by Crown. Several days later, O'Hara received an acceptable service station report.

70. During the period from mid-1970 until early 1972, Margaret E. Kling was the independent operator of the Crown service station in York, Pennsylvania. Throughout the time that she operated her Crown service station, Mrs. Kling was told by Crown representatives when to raise and when to lower her retail gasoline prices. A sales representative would telephone Mrs. Kling and tell her to raise her retail gasoline price at a particular hour, such as 3:00 P.M. Mrs. Kling was also told by Crown that she was required to post only retail gasoline prices dictated by Crown and could not independently raise or lower her retail gasoline prices. She was told that she should follow these instructions or lose her station.

71. The Branded Service Station Lease and Dealer Agreement which Crown offered to plaintiff Myers is identical in form to the Leases and Dealer Agreements executed by all present Maryland Crown service station dealers. This Lease and Dealer Agreement provides, in relevant part:

"6. MINIMUM GALLONAGE: Dealer agrees not to sell less than ————— gallons of motor fuel during any calendar month and not less than twenty percent (20%) of such monthly quantity during any week (Sunday through Saturday).

In the event Dealer has failed to sell the above minimum quantities of motor fuel during any applicable period, for reason other than those beyond reasonable control of Dealer as provided in Paragraph 8, Crown may, in its absolute discretion, immediately terminate this Agreement without further demand, upon giving Dealer written notice of such termination, which notice shall not be less than is required by applicable state law, if any.

\* \* \* \* \* \*

"9. PRICES: Prices for respective products shall be

(a) Motor Oils and Automotive Products: Crown's established dealer price in effect at the time and place of each delivery.

(b) Motor Fuels: The higher of (1) The minimum price for each of the respective grades of motor fuel as specified from time to time by Crown at or before the delivery of such motor fuel to the Dealer; or (2) The Actual Pump Price (after deduction of Federal, State and Local Excise and Sales Tax, if any) charged by the Dealer, less the applicable Dealer Discount as stated in Exhibit 'B';"

72. The pricing provisions contained within the new Lease and Dealer Agreement essentially continue Crown's pricing policies which have been in effect since the beginning of Crown's dealer multipump program.

73. Crown's purpose in adopting the pricing provisions set forth above and the necessary effect of those provisions are to preclude independent Crown service station dealers from posting retail gasoline prices other than those designated by Crown. Under the terms of the Lease and Dealer Agreement, were a dealer to post prices higher than those suggested by Crown, Crown would automatically raise the wholesale price at which the dealer purchased gasoline from Crown. Thus the dealer would be deprived of additional profit that he might make by reason of the price increase.

74. Were a dealer to independently raise his gasoline prices above levels suggested by Crown, his gallonage sales would normally decrease. Under the terms of the new Lease and Dealer Agreement, however, were the dealer's sales to decrease in any seven-day period to less than twenty percent of his stated

monthly gallonage, Crown may, in its discretion, terminate the dealer. Thus, under the new Lease and Dealer Agreement, a dealer risks termination if his price increase causes his gallonage sales to fall below the prescribed level within the seven-day period.

#### (d) *Findings Concerning Motor Oil Sales*

75. Crown desired all of the motor oil business of independent Crown dealers.

76. Crown required all of its independent multipump service station operators to carry only Crown brand motor oils, and prohibited Crown dealers from carrying other brands of motor oils.

77. In order to obtain a lease of a Crown multipump service station, it was necessary for a dealer to agree to purchase and sell only Crown motor oils. Crown's policy has been set forth in Dealer and Equipment Loan Contracts signed by each plaintiff, which provided under the heading "Products" that the dealer agrees to purchase only gasoline and motor oil products marketed by Crown.

78. Crown Sales Representatives and Crown District Managers enforced this motor oil policy by insisting that dealers purchase and sell only Crown brand motor oils, in various instances threatening termination of dealer leases when dealers resisted this requirement.

79. In 1969, plaintiff Frank Tumminello requested permission of Crown to sell Quaker State motor oil as a supplement to his Crown sales, in order to fulfill requests of customers who desired Quaker State. Crown District Manager Clark Corcoran and Regional Manager Thomas Cahir informed plaintiff that he could not sell Quaker State motor oil, but must sell only Crown motor oils.

80. In 1970 or early 1971, plaintiff Charles Freitag, in response to certain customer preferences, requested of Crown District Manager John Conway permission to offer Quaker State motor oil as a supplement to his Crown sales. Conway told Freitag that he could not do so and must sell only Crown brand motor oils.

81. During a period of time in 1971, when Crown was unable to supply its independent dealers, including plaintiff Carroll Myers, with sufficient quantities of Crown motor oils, Myers requested permission to supplement his Crown stock with Quaker State motor oil. Crown denied him permission to sell Quaker State at his station.

82. In March 1973, Crown District Manager Edward Gillespie met with plaintiff Myers to discuss his status as a Crown dealer. During this meeting, Gillespie made it clear to Myers that he would be jeopardizing his position with Crown were he to follow the example of Crown dealer John Phillips, who was selling and advertising the sale of Quaker State motor oil.

83. In late 1972, Crown was not furnishing plaintiff John Phillips with a 10W30 grade motor oil. Phillips decided to offer his customers a 10W30 grade motor oil, and, in response to customer requests for Quaker State motor oil, he began to sell Quaker State 10W30 grade motor oil as a supplement to his line of Crown motor oils. He stored his stock of Quaker State in the back room of his station. He did not display any Quaker State Oil on the oil display racks adjoining his gasoline pumps. He feared he would risk his Crown dealership if Crown discovered that he was selling Quaker State motor oil. On December 14, 1972, Crown Sales Representative Donald Head discovered that Phillips was selling Quaker State motor oil, and on December 19, 1972, Phillips was called to a meeting with District Manager Edward Gillespie and Donald Head. At this meeting, Gillespie informed Phillips that his lease and dealer agreements were being cancelled and that he was to be placed on only a six-month lease. Gillespie told Phillips that he was being placed on probation, and put before him a copy of Crown's "Standards of Service Station Operations", which he

instructed Phillips to read and sign. The Crown "Standards" prohibited Crown service station dealers from marketing or promoting any products not specifically authorized by Crown.

84. In December 1972, when Phillips was placed on probation, he was selling Quaker State out of his back room, but until that time, had never displayed Quaker State motor oil or advertised the sale of Quaker State motor oil.

85. On February 27, 1973, Phillips first undertook the promotion of his Quaker State motor oil sales. He placed Quaker State motor oil on the display racks at his station, and he set up the standard small Quaker State curb sign. On the following day, District Manager Gillespie visited Phillips' station and discovered this promotional activity. On the telephone on that same day, Gillespie informed Phillips that, by selling Quaker State, he was in violation of his Crown Dealer and Equipment Loan Contract. He told Phillips that he was not permitted to sell products other than those authorized by Crown, and he told Phillips that he was in violation of Crown's "Standards". Gillespie indicated to Phillips that if he continued his marketing of Quaker State, he would be evicted from his station in July 1973, which was the end of Phillips' probationary term.

86. Crown District Manager John Conway and Sales Representative Donald Head instructed Crown service station dealer Margaret Kling that she would not be permitted to sell motor oils other than Crown brand motor oils, and could not sell Quaker State motor oils at her Crown station. In order to satisfy certain customers who requested to purchase Quaker State motor oils, Mrs. Kling stocked a small amount of Quaker State motor oils in the back room of her service station, but did not display Quaker State motor oils at the pump islands. On one occasion, Crown Sales Representative Donald Head discovered Quaker State motor oils in Mrs. Kling's back room and told her that she could

not have that oil at her station. Head instructed Mrs. Kling that she would not be permitted to sell Quaker State oil at all.

87. In the latter part of 1972, Crown increased the wholesale price of Crown motor oils, that is, the price paid to Crown by independent Crown dealers. Shortly thereafter, Crown prepared permanent-type, plastic motor oil price signs for display, bearing the motor oil prices set by Crown for each grade of Crown motor oils. The aim of Crown's policy was to achieve uniform motor oil prices at Crown stations.

88. Crown instructed independent Crown dealers concerning the prices to be charged for Crown brand motor oils. In early 1973, Crown Sales Representative Donald Head told plaintiff Tumminello the prices which Crown wanted him to charge for Crown motor oils. Tumminello told Head he did not want to charge these prices, and Head replied that Tumminello's lease was coming up for renewal and Tumminello was doing nothing to help himself by refusing to go along with Crown's motor oil price policy. Tumminello again refused. Shortly thereafter, Head returned to Tumminello's service station with the price signs and Head gave Tumminello a choice: Tumminello could post the prices specified by Crown, or Head would place Tumminello's name on a Crown "blacklist" to be sent to higher Crown authority, thus placing his dealership in jeopardy. Sales Representative Donald Head advised plaintiffs Phillips, Freitag and Myers of Crown's requirement that all service station dealers post uniform motor oil prices.

(e) *Findings Concerning Restrictions on Antifreeze, Vending Machines and Vending Machine Products*

89. Crown has designated the antifreezes which its dealers may sell and has prohibited the sale of other antifreezes. From mid-winter of 1970–71 until the mid-winter of 1972–73, Crown required its dealers to purchase only

Prestone brand antifreeze. This policy was set forth in Crown interoffice memoranda and directives. On December 3, 1970, Crown District Manager John Conway issued a directive on antifreeze, pertaining to all multipump stations, advising his Sales Representatives that only Prestone antifreeze was to be sold at such Crown stations. Crown had previously permitted dealers to purchase and sell other brands of antifreeze, including RPS and Xerex brand antifreezes. The policy announced on December 3, 1970 required dealers to sell out their remaining stocks of antifreeze and thereafter to sell only Prestone. Crown supplied Prestone to dealers.

90. In December 1972, Crown distributed to its dealers its "Standards of Service Station Operations". These "Standards" provided that Prestone and Xerex antifreeze in factory packaged quart containers were the only antifreeze products which could be sold or offered for sale at Crown stations. These "Standards" are now embodied in Crown's new 1973 Lease and Dealer Agreement.

91. Crown has conditioned the lease of Crown multi-pump service stations to dealers upon the express requirement that Crown dealers purchase and sell only antifreezes specified by Crown. Crown derives no profit from the sale by its dealers of Prestone and Xerex antifreeze.

92. With regard to vending machine items, during the period when multipump stations were company operated, Crown developed a promotion whereby cigarettes were sold at 30 cents per pack through machines owned by Crown. The purpose was to draw customers to the Crown stations who would then buy gasoline. The 30-cent cigarette promotion proved effective in building gallonage, and as dealers took over operation of Crown multipump stations, it was continued.

93. In 1969, Crown entered into an agreement with Select Vending Company, a vending machine company operated by Austin Fine, a friend of Crown Central Petroleum President Henry Rosenberg. The agreement provided for an agreed-upon retail price for cigarettes, and for the paying of no sales commissions to Crown or to Crown dealers. The agreement was summarized and embodied in a letter from Thomas Cahir to Austin Fine, dated September 19, 1969.

94. Fine accepted the original agreement, involving the sale of cigarette products at a promotional price, with the expectation that he would receive from Crown the right to control all vending machine business at Crown stations. The original agreement afforded to Select Vending Company this control with respect to cigarette vending machines and candy machines at Crown service stations. Later in 1971, when Select Vending Company began to market soda vending machines, Crown determined that Select should be the sole soda machine supplier at Crown stations.

95. In late 1972, Crown issued to its dealers its "Standards of Service Station Operations". These "Standards" reiterated Crown's verbal instructions to its dealers. The "Standards" provided that the dealer could utilize only vending machines furnished by a vending machine supplier designated by Crown.

96. In 1973, Crown's objectives were embodied in its new Lease and Dealer Agreement. Such 1973 Lease and Dealer Agreement specifically sets forth the requirement confining dealers to the services of Select Vending Company. Addendum Number 1 to the new Lease provides that Crown reserves a portion of station premises to itself, and that, pursuant to an agreement dated June 21, 1973, with Select Vending, Crown has awarded all rights to install, operate and maintain vending machines at the station to that company.

97. A part of the 1973 Lease and Dealer Agreement is a copy of the contract executed by Crown and Austin Fine, trading as Select Vending. This contract provides that Crown grants to Fine the "sole exclusive right to place,

maintain and operate" vending machines at Crown service stations. In return for this right, Fine has agreed to pay Crown a commission of one cent per package on cigarettes, which commission is then paid or credited to Crown dealers. Crown thus derives no profit from the sale of cigarettes, candy or soda through vending machines.

98. Crown has conditioned the lease of Crown multipump service stations to dealers upon the express requirement that Crown specifies the supplier of vending machines at Crown service stations.

## DISCUSSION

### (a) Horizontal Price-Fixing

 The reach of the Sherman Act is extensive, and any concerted activity the goal of which is to fix, raise, depress or maintain prices is unlawful *per se*. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 221–224, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Thus, stabilizing prices as well as raising them is within the ban of Section 1 of the Sherman Act. United States v. Container Corporation of America, 393 U.S. 333, 337, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969). Any combination of competitors which tampers with price structures is engaged in unlawful activity, and even though members of a price-fixing group are in no position to control the market, to the extent that they stabilize prices they directly interfere with the free play of market forces. United States v. Container Corporation, *supra* at 337, 89 S. Ct. 510.

Gasoline is a fungible commodity, and price is the most important competitive factor for a retail service station. Gray v. Shell Oil Company, 469 F.2d 742, 744 (9th Cir. 1972). This is partic-ularly true insofar as Crown and other competing independent companies in the Baltimore metropolitan area are concerned. These independents do a discount type of business and generally sell at prices lower than those charged at service stations supplied by major oil companies.

 The record in this case indicates that since the late 1960's, Crown and several of its competitors were jointly committed to a policy of avoiding "gas wars" in the Baltimore marketing area. Moreover, the evidence shows that these independent companies were quite successful in their efforts. Representatives of Crown who testified in this case were proud of the price stability which had been achieved in and around Baltimore in the late 1960's and early 1970's. However, the efforts undertaken jointly by these competitors to stabilize gasoline prices run afoul of Section 1 of the Sherman Act. The elimination of competitive evils such as price-cutting or other ruinous competition is no legal justification for a combination entered into between competitors for the purpose of stabilizing prices. *See* United States v. Socony-Vacuum Oil Co., *supra* at 220–221, 60 S.Ct. 811.

 The evidence in this case goes well beyond the mere exchange of price information among competitors.[6] What has been shown by the totality of the evidence is that from the late 1960's when Crown began its multipump dealer program until the date these suits were filed, Crown has continually agreed with its competitors to increase the retail prices of gasoline sold at stations supplied by it and to take other joint action to eliminate local depressed pricing conditions.[7] Crown and certain of its competitors exchanged information

---

6. The evidence in this case does not support Crown's contention that its communications with competitors were a good faith effort to comply with the antitrust laws pursuant to Section 2(b) of the Clayton Act, as amended by the Robinson-Patman Act. 15 U.S.C. § 13(b).

7. No evidence was produced of similar agreements to fix wholesale prices, and this Court does not find that Crown engaged in a horizontal conspiracy to fix wholesale prices.

about impending price changes, and each company knowingly acted on information previously received from competitors in setting the retail prices of gasoline sold at its stations. Crown and its competitors acted in concert to correct price disturbances in certain local areas in order to avoid price competition from major oil companies as well as from other independent companies. As a result of these illegal activities on the part of Crown and its competitors, retail gasoline prices charged by these independent service station dealers in the Baltimore metropolitan area have been stabilized and maintained at artificial levels during the years in question.[8]

This is not a case in which plaintiffs were compelled to rely solely on circumstantial evidence of illegal concerted activity. In this case, there has been direct testimony of agreements reached between Crown and competitors to raise or stabilize retail prices. Particular weight has been accorded the testimony of Howard E. Knox, who, between 1969 and 1971, was Administrative Assistant and Secretary to the President of PMC, a competitor of Crown. Knox testified concerning various conversations between representatives of his company and representatives of Crown and of other companies in which agreements were reached to raise or stabilize the retail prices of gasoline. The testimony of the witness Knox was supported by that of various other witnesses, including several of the plaintiffs themselves and several other Crown dealers who had become aware of price-fixing agreements between Crown and its competitors.

From the time it began its multipump program, the wholesale price which Crown charged plaintiffs and other dealers had a direct, fixed relation to the retail price which the dealers charged their customers. In fact, Crown did not determine the wholesale prices to be charged its dealers on the basis of general competitive factors in the wholesale market. Rather, Crown first decided what the retail price of its gasoline should be and then worked back to the wholesale price it would charge the dealer.

This fixed and constant relationship between wholesale and retail prices was spelled out in the new Lease and Dealer Agreement adopted by Crown in 1973, as discussed more fully hereinafter. The new Lease did no more than reduce to writing a policy which had been in effect for a number of years. What is apparent from such a policy is that Crown's financial planning and projections focused on the retail price of its product. Thus, it was imperative for Crown to take steps to fix and stabilize retail prices charged in its market area so that it might maximize the profits it derived from sales at wholesale. If Crown would have been unsuccessful in persuading a competitor to raise its retail price to the level being charged by Crown and other competitive stations, Crown would then have been compelled to permit its dealer to charge a competing price and would then have had to reduce its wholesale price to such dealer.

Occasionally, a competitor would not go along with this illegal scheme and would draw the ire and scorn of Crown and other independent companies. On some occasions, Hudson Oil Company refused to agree with the others to raise or stabilize its retail prices. Hudson was thus described as a "difficult competitor" by a representative of one of the conspirators, who further testified that one could not determine how far Hudson would go to "destroy the market". On one occasion District Manager Joseph Gilboy of Crown engaged in a "hot" telephone conversation with a representative of Hudson, during which Gil-

8. There can be little doubt that Crown's anticompetitive conduct had a substantial effect on interstate commerce. *See* Greenville Publishing Co. v. The Daily Reflector, Inc., 496 F.2d 391, 395 (4th Cir. 1974). Crown was fifth in the State in gasoline sales, and its stations sell over 60 million gallons annually in the Baltimore metropolitan area.

boy was unsuccessful in persuading the Hudson representative to raise its retail prices to those being charged by a competing Crown service station.

In comparison with the readiness of competing independent companies to supply Crown with information about impending price changes, major oil companies rebuffed attempts by representatives of Crown to discuss retail prices. James C. Blackman, who is Regional Office Manager of Crown for the Mid-Atlantic Region, testified that major oil companies would not talk to him when he telephoned in an attempt to discuss retail prices. Blackman was told by a representative of Exxon in 1970 that such company could not reveal pricing information and that "We don't discuss pricing information, whatsoever, over the telephone."[9]

In an unusual post-trial effort to avoid the damaging testimony of the witness Knox, Crown has filed a motion to strike such testimony in its entirety, relying on a post-trial deposition of this witness taken in another case. In the alternative, Crown asks that this Court, in evaluating the credibility of the witness Knox, consider such deposition as a part of the record in this case.

Crown has cited no case in which a court has stricken the testimony of a witness given in open court at a trial because of later deposition testimony of the witness in another case. Final argument in this case was heard on January 31, 1975. On February 13, 1975, the deposition of Knox was taken in Petroleum Marketing Corporation v. Midway Petroleum, Inc., Civil No. 73–79–N and Midway Enterprises, Inc. v. Petroleum Marketing Corp., Civil No. 73–1178–N, which are private actions pending in this Court involving antitrust claims similar to some of those here.[10] Knox had testified in this case on November 14, 1974. Armed with a transcript of the testimony Knox gave at this trial, counsel for PMC questioned Knox closely at the subsequent deposition concerning all aspects of his testimony that PMC had conspired with Crown and other independent oil companies to fix and stabilize prices in the Baltimore area.

If Crown's motion is considered to be in the nature of a motion for a new trial based on newly-discovered evidence, it would clearly fail. To succeed in such a motion, the moving party must establish that the evidence was such that it could not have been discovered by the exercise of diligence in time to be presented in the original proceedings and that the evidence was not merely cumulative or tending to impeach or contradict a witness. United States Fidelity & Guaranty Co. v. Lawrenson, 334 F.2d 464, 466 (4th Cir.), cert. denied 379 U.S. 869, 85 S.Ct. 141, 13 L.Ed.2d 71 (1964); Stiers v. Martin, 277 F.2d 737 (4th Cir. 1960).

What might be considered "newly-discovered evidence" here resulted from a deposition taken in other litigation after the trial in this case was concluded. When Knox testified in this case, counsel for Crown had in their possession a copy of an affidavit of Knox indicating the nature of his testimony. It does not appear that Knox's deposition was taken in this case, but no reason appears why that could not have been done before he testified at the trial on November 14, 1974. The evidence now relied upon by Crown was in existence at the time of the trial in this case and could have been discovered by the exercise of due diligence by Crown's attorneys. See Butts v. Curtis Publishing Co., 242 F.Supp. 390, 392 (N.D.Ga. 1964), aff'd 351 F.2d 702 (5th Cir. 1965), aff'd 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). In any event,

9. A representative of Shell told him the same thing.

10. Plaintiffs' counsel here also represented Midway in those other cases. However, when such counsel appeared at the deposition of February 13, 1975, they were representing Midway in those cases and not these plaintiffs in this case.

the deposition testimony of Knox in the other case would merely be impeaching, even if this Court were to agree that it should be a part of the record here.

Moreover, even were such deposition testimony of the witness Knox to be considered by the Court in this case, it would not affect the weight which this Court has accorded the trial testimony of the witness Knox. Many of the claimed differences between the later deposition testimony and the trial testimony are not inconsistencies at all when the testimony given by the ...tness on these two occasions is considered in its entirety. Other differences claimed by Crown to exist relate to minor matters and do not detract from Knox's testimony at the trial concerning the elements of the illegal conspiracy. The witness appeared live at the trial and the essence of his testimony is supported by other evidence in the case.

■ This Court concludes that the deposition in question is not properly a part of the record here. This Court further concludes that even if it were, such deposition testimony would not in any event affect the weight which has been given to Knox's trial testimony. For these reasons, Crown's motion to strike or disregard the testimony of the witness Knox will be denied.[11]

### (b) Vertical Price-Fixing

■ Resale price-fixing is a *per se* violation of the Sherman Act, whether done by agreement or combination. Albrecht v. Herald Co., 390 U.S. 145, 151, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 213, 71 S.Ct. 259, 95 L.Ed. 219 (1951); Pearl Brewing Co. v. Anheuser-Busch, Inc., 339 F.Supp. 945 (S.D.Texas 1972). It was established many years ago that written contracts with customers obligating them to sell at prices fixed by the vendor are void because they violate the Sherman Act. Dr. Miles Medical Co.

v. Park & Sons Co., 220 U.S. 373, 31 S. Ct. 376, 55 L.Ed. 502 (1911). Moreover, an unlawful combination exists when a defendant enters into such an agreement which may be implied from a course of dealing with a customer or from other circumstances which bind the customer to observe fixed resale prices. United States v. A. Schrader's Son, Inc., 252 U. S. 85, 99, 40 S.Ct. 251, 64 L.Ed. 471 (1920).

■ In United States v. Parke Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), the Supreme Court held that an illegal combination to fix prices results if a seller suggests resale prices and secures compliance by means in addition to the mere announcement of the policy and a simple refusal to deal. As noted by the Supreme Court in *Albrecht, supra* at 149, 88 S.Ct. 869, the illegal combination with retailers in the *Parke Davis* case arose because their acquiescence in the suggested prices was secured by threats of a termination of dealing. Thus, if a retailer unwillingly complies with a wholesaler's suggested or recommended price, he may properly claim that an illegal combination exists under Section 1 of the Sherman Act. *See* Albrecht v. Herald Co., *supra* at 150, n. 6, 88 S.Ct. 869; United States v. Parke Davis & Co., *supra*. With specific reference to the industry involved here, it has been held that a supplier of gasoline like Crown may not use coercion on its retail outlets to achieve resale price maintenance, and it does not matter what the coercive device is if its effect is to fix such prices. Simpson v. Union Oil Co., 377 U.S. 13, 17, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964).

■ The evidence in this case indicates that during the period involved here, Crown fixed and controlled the retail prices at which its dealers, including the plaintiffs, resold gasoline to the public. The plaintiffs and other dealers have been forced by means of threats and other coercive practices to post re-

---

11. An Order to such effect has this date been entered.

tail gasoline prices determined by Crown. The plaintiffs were threatened with the termination or nonrenewal of their service station leases when they objected to Crown's illegal pricing policies, and because of their desire to set their own retail prices and to otherwise act independently, they were eventually notified that their leases would not be renewed.

Since 1968, when Crown changed from company-owned to dealer-operated stations, its basic policy has been to fix the retail prices at which its gasoline would be sold in Maryland. The findings in this case of an illegal horizontal combination between Crown and certain competitors directly complement and support the findings of illegal vertical agreements with dealers. To carry out its agreement with competitors to fix and stabilize gasoline prices in the Baltimore area, it was necessary for Crown to control the prices charged by its dealers. Quite obviously, Crown could not fulfill its undertakings with competitors if its dealers were truly independent insofar as their retail price structure was concerned.

Before 1968, when Crown owned and operated the stations, it had of course itself fixed the retail prices of gasoline. And it continued to do so after converting to a multipump operation. Its corporate officers were firmly committed to the view that Crown alone knew what prices should be charged by its "independent" dealers for the maximization of their and Crown's profits. Indeed, as noted previously, Crown's wholesale price was determined from the retail price, and its officers thus desired to fix the retail price in accordance with their own understanding of the market rather than that of each dealer.

But whether or not Crown possessed the resources, expertise and know-how which might make it as supplier-landlord better able than any retailer-lessee to determine the optimum retail price in a particular area, its policy was in clear violation of the Sherman Act. When it switched to dealer-operated service stations, Crown could not have its cake and eat it, too. Company-operated stations had not been successful. Attendants were paid salaries and had little incentive to provide fast and efficient service. Thus, the change was made to independent operators, and they were given a direct economic stake in the operation of the station. Yet Crown would not permit independence in the most critical area of all, the setting of the retail price of the gasoline.

A wholesaler like Crown must make a clear-cut choice when deciding whether or not to switch from company-operated to dealer-operated stations. If such a company owns and operates its own stations, it may itself set its retail prices without committing a *per se* violation of the Sherman Act. If it leases stations to independent dealers, it must leave the determination of the retail prices to the unfettered discretion of the dealers. Coercion of any kind is not permitted, whether by written contract or oral threats, because a coerced agreement to fix prices cripples the freedom of traders and thereby restrains their ability to sell in accordance with their own judgment. Kiefer-Stewart Co. v. Jos. E. Seagram & Sons, *supra* at 213, 71 S.Ct. 259. As the Supreme Court said in Simpson v. Union Oil Co., *supra* at 20–21, 84 S.Ct. at 1056:

> Dealers * * * are independent businessmen; and they have all or most of the indicia of entrepreneurs, except for price fixing. The risk of loss of the gasoline is on them, apart from acts of God. Their return is affected by the rise and fall in the market price * * *. Practically the only power they have to be wholly independent businessmen whose service depends on their own initiative and enterprise, is taken from them by the proviso that they must sell their gasoline at prices fixed by [their supplier].

Various devices were used by Crown to achieve its unlawful objectives. At

the outset, Crown dealers were openly told when to raise or lower their prices.[12] In the early years of the new program, few dealers questioned the right of their supplier-landlord to dictate their retail prices. But as time went on, there were differences of opinion between dealers and Crown as to the proper price for the dealer to charge to make the most profit. However, Crown was able to coerce compliance with its pricing policies by threats of termination. Its leases in the early years were for one-year terms and could be cancelled on five days' notice. Few were the dealers who would risk cancellation by setting a retail price at variance with Crown's directives.

In March 1972, Crown, was sued in this Court by a dealer named Edward R. Brennan, who claimed an illegal vertical agreement to fix prices in violation of the Sherman Act. Brennan v. Crown Central Petroleum Corporation, Civil No. 72–264–HM. The suit was settled soon after it was filed, and Crown then abandoned the 5-day cancellation provision and decided merely to "suggest" retail prices to its dealers. However, the "suggestion" was backed up by a big stick. The evidence produced at trial supports the finding of coercive pressure previously made by this Court in granting the preliminary injunction.[13] As this Court previously said (376 F. Supp. at 1256):

> Furthermore, Crown also admits that it gave its dealers "suggested" retail prices to be charged. Faced with short-term leases and having

built up good will over a period of years, an independent dealer would not have to be confronted with very much outside pressure to be required to conform to what Crown wanted, rather than setting a price that he might independently think appropriate under existing market conditions. A few words or a veiled threat would be enough to make him toe the line. The facts here indicate the existence of such pressure which would convert a suggested price into a required price. See Lehrman v. Gulf Oil Corp., 464 F.2d 26, 37–41 (5th Cir. 1972).

Those dealers who did not go along with the retail price suggested by Crown found that they were suddenly receiving unfavorable inspection reports. A new District Manager named Edward Gillespie was transferred into the Maryland area to put teeth into Crown's policy of maintaining strict control over its dealers and their retail prices. A former officer in the United States Marine Corps, Gillespie served as the hatchet man for Crown in stamping out the independence that many of its "independent" dealers displayed after the Brennan suit.[14]

Dealers who had been the most independent of all, like the plaintiffs, received Gillespie's immediate attention. Plaintiff Phillips had been a dealer since December 1970, and plaintiff Tumminello had been a dealer since March 1968. Both had good performance records. Claiming that they were now unsatisfactory in several particulars, Gillespie offered a "probationary" six-month lease

12. Indeed, a 1968 memorandum of Crown outlined the conditions and operating procedures for independent dealers, flatly stating that pump postings were to be "at Crown's discretion" and that the understanding as to prices was to be "verbal".

13. In its previous opinion in this case, this Court noted that because of the conflicting affidavits and the lack of an evidentiary hearing, a particularly strong showing had not been made by the plaintiffs of the likelihood of their success at trial. 376 F.Supp. at 1257. After hearing all the testimony at

the trial and studying the exhibits, this Court is satisfied that the evidence of illegal vertical price-fixing by Crown is clear and convincing and that plaintiffs have satisfied their burden of proving this antitrust violation.

14. As described by a memorandum in Crown's files dated May 3, 1972, dealers were "feeling their oats" after the Brennan matter, and it was necessary for the District Managers to get back the "teeth" they had prior thereto.

to Phillips in December 1972 and a similar probationary lease to Tumminello in February 1973. Both of these dealers had previously indicated a desire to act independently in setting their own retail prices, and it was Gillespie's intention to bring them into line. Phillips and Tumminello responded by filing suit and were thereafter advised that their leases would be allowed to expire. Also objecting to coercive pressures by Crown, plaintiffs Freitag and Myers filed suit in May 1973. They were likewise told that their leases would not be renewed.[15]

After these actions were commenced, Crown tried yet a third approach for fixing its dealers' retail prices. Realizing that short-term leases between a supplier and a dealer are by their very nature coercive,[16] Crown switched to a three-year lease but, at the same time, included new pricing provisions designed to pressure their dealers to conform to the retail prices desired by Crown. Under Paragraph 9 of the new Lease and Dealer Agreement, the wholesale price to be charged a dealer is tied directly to the retail price he charges. If a dealer raises his retail price by one cent a gallon, he is compelled to pay three-quarters of a cent a gallon more as his wholesale price. In addition, Paragraph 6 of the new Lease requires the dealer to sell a specified minimum number of gallons a week. If he does not, Crown may in its absolute discretion terminate the lease after giving the notice required by state law.

■ It is not necessary to decide in this case whether every agreement between a supplier-landlord and a dealer-tenant in which the wholesale price paid is directly pegged to the retail price charged amounts' to illegal vertical price-fixing. The agreement here included in addition a gallonage clause requiring the sale by the retailer of a specified number of gallons each week for a continuation of the lease. In combination, these provisions are coercive and bring illegal pressure on plaintiffs and other Crown dealers to conform to the retail price desired by Crown.[17]

■ The provisions in question, added to Crown's standard lease after these suits were filed and after careful discussion with counsel, represent a studied effort to find a means whereby Crown might continue, without offending the anti-trust laws, its basic policy of pressuring dealers to fix the retail prices which it deems appropriate. This new approach, like the old, must fail. Innovative devices employed by inventive businessmen to circumvent the Sherman Act must be subjected to close scrutiny. Pearl Brewing Co. v. Anheuser-Busch, Inc., *supra* at 952; Lehrman v. Gulf Oil Corp., 464 F.2d 26, 37 (5th Cir. 1972). The overall effect here of these provisions of the new Lease is as repressive as other coercive measures employed by Crown. Any rise in the retail price automatically increases a dealer's wholesale price, thus restricting the dealer's margin of profit.[18] Furthermore, any such increase in the retail price might be expected to have the short-term effect of decreasing weekly gallonage figures, subjecting the dealer to the risk of immediate notice of cancellation. Dealers who sign the new Lease are hardly free to sell in accordance with their own un-

---

15. As noted previously, plaintiff Myers was offered a new one-year lease, but objected to certain coercive provisions. The terms of renewal were thus never agreed upon.

16. *See* Phillips v. Crown Central Petroleum Corporation, *supra*, 376 F.Supp. at 1256; F.T.C. v. Texaco, 393 U.S. 223, 226–227, 89 S.Ct. 429, 21 L.Ed.2d 394 (1968); Shell Oil Co. v. F.T.C., 360 F.2d 470, 487 (5th Cir. 1966).

17. Because of federal price controls, Paragraph 9(b) of the new Lease has not been operative. However, the necessary effect of Paragraphs 6 and 9 together is to illegally fix resale prices.

18. In Lehrman v. Gulf Oil Corp., *supra* at 40, the Fifth Circuit observed that a wholesaler has no more right to dictate to a retailer an appropriate margin of profit on retail sales than to set his retail prices outright.

fettered judgment. *See* Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, *supra* 340 U.S. at 213, 71 S.Ct. 259. By the use of the provisions in question, Crown is employing "other means which effect adherence" to its policy of setting retail prices for its dealers. United States v. Parke Davis & Co., *supra* 362 U.S. at 44, 80 S.Ct. 503.

That Crown has been firmly committed to a policy of fixing the prices of its dealers is shown by events which occurred even after these suits were filed. The evidence indicates that as late as August 1973, District Manager Gillespie pressured dealers Horner and O'Hara to conform to Crown's "suggested" retail prices. Such persistent conduct further indicates Crown's continuing desire, even after such right was challenged in this Court, to control its dealers' retail prices because of the basic importance of such prices to its financial planning and other business decisions.

■■■ The evidence also shows that Crown fixed the retail sales price of motor oils sold by its dealers. As discussed hereinafter, Crown required its dealers to sell only Crown motor oil instead of competitive brands. It sought to achieve uniformity in the prices at which its dealers sold its motor oil and in the latter part of 1972 prepared permanent signs for display by dealers showing the prices which dealers should charge for each grade of motor oil. In 1973, a Crown sales representative threatened plaintiff Tumminello with loss of his lease if he did not conform to Crown's pricing policy for motor oils. Other plaintiffs were told that dealers were required to post uniform motor oil prices. On the record here, this Court concludes that Crown has illegally fixed motor oil resale prices of plaintiffs as well as their gasoline resale prices.

### (c) *Tying Arrangements*

■■■ A tying agreement has been defined as an agreement by a party to sell one product but only on the condition that the buyer also purchase a different product, or at least agree that he will not purchase that product from any other supplier. Northern Pacific Railway Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); Osborn v. Sinclair Refining Company, 286 F.2d 832, 838 (4th Cir. 1960). The law has been violated if a defendant compels his customers when they seek to buy the desired (or tying) product to purchase a quantity of another (or tied) product. Osborn v. Sinclair Refining Company, *supra* at 838.

■■■ A tying arrangement is illegal *per se* whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a not insubstantial amount of interstate commerce is affected. Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 499, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); Advance Business Systems & Supply Co. v. SCM Corp., 415 F.2d 55, 65 (4th Cir. 1969). Even if a plaintiff cannot prove that a tying arrangement is *per se* illegal, he may still prevail on the merits whenever he can prove "on the basis of a more thorough examination of the purposes and effects of the practices involved, that the general standards of the Sherman Act have been violated." Fortner Enterprises, Inc. v. United States Steel Corp., *supra* at 500, 89 S.Ct. at 1257.

In this case, plaintiffs claim that Crown has illegally required them to sell Crown motor oil instead of competitive brands and that such a tying agreement is *per se* illegal. However, plaintiffs are not claiming here that Crown's restrictions concerning the sale of antifreeze and vending machine products are likewise *per se* illegal. Recognizing that Crown receives no profit nor other direct monetary enrichment with respect to these other restraints and that the sales of such products are merely incidental to Crown's primary business purpose, plaintiffs instead contend that these tying arrangements are unreasona-

ble restraints of trade under general principles applicable to the Sherman Act.[19]

■ Taking up first plaintiffs' claim concerning motor oil, this Court is satisfied from the evidence that Crown dealers have been required to sell only Crown motor oil at their stations and have not been permitted to sell any competitive brand such as Quaker State motor oil, even though the quality of such other brand may be undeniably high. Thus, the proof shows that Crown has tied the sale of a secondary product, motor oil, to the sale of the principal product, gasoline, under arrangements it has made with its dealers.

■ Little question exists in this case concerning the economic power which Crown exerts as to buyers (i. e. its dealers) in the applicable market. An appreciable restraint of free competition results whenever the seller can exert some power over some of the buyers in the market, even if the seller's power is not complete over them and over all other buyers in the market. Fortner Enterprises, Inc. v. United States Steel Corp., *supra* at 503, 89 S.Ct. 1252. Here Crown has the power to impose restrictions concerning motor oil with respect to all of its dealers in the Baltimore metropolitan area, totaling some thirty. Crown thus has more than sufficient economic power with respect to gasoline to appreciably restrain competition in the market for motor oil.

■ Insofar as the "not insubstantial amount of commerce" requirement for *per se* illegality is concerned, the controlling consideration is whether the total amount of business foreclosed to competitors by the tie is substantial enough in terms of dollar volume so as not to be merely *de minimis. Fortner,*

*supra* at 501. For purposes of determining whether the amount of commerce foreclosed is too insubstantial to warrant prohibition of the practice, the relevant figure is the total volume of sales tied by the sales policy under challenge, not the portion of this total accounted for by the particular plaintiff or plaintiffs who bring suit. *Fortner, supra* at 502, 89 S.Ct. 1252; Advance Business Systems & Supply Co. v. SCM Corp., *supra* at 63. In denying the petition for rehearing in the *Osborn* case, the Fourth Circuit noted that what the Supreme Court sought to point out in the *Northern Pacific* case was simply that a *de minimis* restraint on competition would not constitute an unlawful tie-in. 286 F.2d at 841. As some of the decisions since *Fortner* have stated this principle, any amount of commerce restrained by an illegal tie-in agreement constitutes a not insubstantial amount of interstate commerce. Falls Church Bratwursthaus, Inc. v. Bratwursthaus Management Corp., 354 F.Supp. 1237, 1240 (E.D.Va.1973).

The evidence here discloses no restraint on commerce which could qualify as a *de minimis* one. Even if the inquiry is confined only to sales of motor oil at Crown stations in the Baltimore metropolitan area, the amounts are not insubstantial. The evidence discloses that in the Baltimore metropolitan area alone, sales of Crown motor oil are approximately 120,000 gallons annually.[20]

In Osborn v. Sinclair Refining Company, *supra,* a service station dealer challenged restrictions imposed by his supplier-landlord which required the dealer to purchase Goodyear tires, batteries and accessories. Sinclair, the supplier, received a commission from Goodyear for the purchases made by its dealers.

---

19. There is no support in the record for plaintiffs' suggestion that Crown did profit directly when Select Vending Company purchased Crown's stock of vending machines.

20. The testimony of Crown's Vice President Loving discloses that Crown annually sold

approximately 60 million gallons of gasoline in the Baltimore metropolitan area and that Crown's sales of motor oil are approximately two-tenths of one percent of its sales of gasoline.

The Fourth Circuit found such a tying agreement to be illegal *per se*. For similar reasons, this Court concludes that the facts here disclose a motor oil tying agreement between Crown and each plaintiff amounting to a *per se* violation of the Sherman Act.

■ The sale of Prestone and Xerex antifreeze and the sale of cigarettes, candy and soda through vending machines now supplied by Select Vending Company raise quite different questions. These products, like the sale of Crown motor oil, are clearly tied products. A dealer who enters into a lease with Crown is restricted to the sale of Prestone and Xerex antifreeze and to the sale of these other vending machine products. But unlike the sale of Crown motor oil, Crown derives no profit or direct monetary gain from the sale of any of these products and these items are not directly related to Crown's principal business purpose of producing and selling petroleum products. A tying arrangement which serves a legitimate business purpose is valid. Fortner Enterprises, Inc. v. United States Steel Corp., *supra* at 506, 89 S.Ct. 1252. However, once the existence of a tie-in is shown, the defendant has the burden of showing a legitimate business reason for imposing the condition. Advance Business Systems & Supply Co. v. SCM Corporation, *supra* at 68, n. 12.

In Miller Motors, Inc. v. Ford Motor Co., 252 F.2d 441 (4th Cir. 1958), the Fourth Circuit upheld the validity of a tying arrangement whereby Ford Motor Company required its dealers to contribute a certain amount per car to a non-profit corporation organized for Lincoln-Mercury dealer advertising. In finding no violation of the Sherman Act, the Court attached significance, *inter alia*, to the fact that the restraint imposed was only an incidental one as the recognized purpose and effect of advertising was to increase trade and not restrain it, and to the fact that the defendant had no financial interest in the advertising agency. 252 F.2d at 446. A similar result was reached in Nelligan v. Ford Motor Company, 262 F.2d 556, 558 (4th Cir. 1959), in which the Court noted, among other pertinent facts, that the restriction had an important bearing on the good will of the defendant and its line of cars and that the defendant had no financial interest in the tied product. *See* David R. McGeorge Car Co., Inc. v. Leyland Motor Sales, Inc., 504 F.2d 52, 58 (4th Cir. 1974).

In Crawford Transport Co. v. Chrysler Corp., 338 F.2d 934 (6th Cir. 1964), cert. den. 380 U.S. 954, 85 S.Ct. 1088, 13 L.Ed.2d 971 (1965), the Court upheld a tying arrangement whereby Chrysler required its dealers to use certain carriers selected by it for the transportation of motor vehicles purchased by the dealer for re-sale. The Court emphasized that Chrysler had no financial interest in any of the transportation carriers it selected and received no direct profits from the performance by them of transporation services. 338 F.2d at 939. *See,* Mid-America ICEE, Inc. v. John E. Mitchell Co., 1973 Trade Cases, ¶ 74,681 at p. 94,990 (D.Ore.1973).

■ Crown's multipump marketing concept is based on the sale of gasoline and motor oil at discount prices in modern, well-lighted, clean and uncluttered service stations featuring fast, efficient service by neatly-groomed attendants. No mechanical or other maintenance work is done, and no sales of general automotive products are permitted. Whereas sales of gas and motor oil are primary objectives, antifreeze is sold merely as an incidental accommodation to customers who ask for it. Sales of cigarettes, candy and soda through vending machines are likewise merely incidental to the primary purpose of the Crown stations.[21]

The tie-ins which exist as to these non-petroleum products are similar to

---

21. The cigarette tie-in, which resulted in sales of cigarettes at discount prices, was specifically designed to attract customers who would then be sold gas and oil.

other restrictions in Crown's new Lease and Dealer Agreement, all of which are designed to enhance Crown's image and lead to the sale of larger quantities of petroleum products. Lessees are restricted in the automotive services they may render at their stations. They may not perform automotive repairs, change motor oil, do lubrication work, drain cooling systems, wash cars or undertake other general automotive services. Lessees may not sell tires, batteries or any other products except as authorized by Crown.[22] Lessees must also conform to many Crown requirements as to displays, lighting, uniforms and many other details. The restrictions imposed by Crown concerning the sale of antifreeze and the other incidental products in question are no more unreasonable than the many other restrictions set forth in Crown's Lease and Dealer Agreement. All of these restrictions are designed for the legitimate purpose of promoting Crown's image and fostering its discount marketing concept.

 The antitrust laws do not require that a dealer-lessee must be permitted to act independently of his supplier-landlord insofar as all of his activities are concerned. As Judge Haynsworth recognized in his dissent in Osborn v. Sinclair Refining Company, 324 F.2d 566, 579 (4th Cir. 1963), a supplier who is the owner of the premises where the retail business is conducted may impose reasonable restrictions designed to make the property an effective retail outlet for the sale of the supplier's products.[23] Quite clearly, a dealer must be free to act independently insofar as pricing policies are concerned, and a supplier-landlord may not require that its motor oil be sold as well as its gasoline and may not tie-in other products which unreasonably restrain trade. But it is entirely reasonable for Crown to re-quire that its lessees sell only top quality antifreeze and that vending machine products sold at Crown service stations be of similar good quality or be otherwise designed to promote sales. Garishly-painted vending machines and cheap antifreeze would detract from the image which Crown seeks to project. The restrictions challenged are thus reasonably designed to preserve good will and to further Crown's legitimate business interests. See Advance Business Systems & Supply Co. v. SCM Corporation, supra at 68, n. 11.

Were this Court to hold that restrictions such as these are unreasonable restraints of trade under the circumstances of this case, the Court would necessarily also be compelled to hold that restrictions prohibiting the sale by Crown dealers of tires, batteries and accessories and prohibiting the rendering of general automotive services are likewise unlawful. The effect of such a ruling would deny Crown the right to engage in its multipump, discount business through dealer-lessees in the manner in which it has operated in the past. If all these restrictions are unlawful, a dealer who signed a Crown lease would be permitted to sell what he wished and perform whatever automotive services he desired, even though operating a station on Crown's property and selling its gasoline. The antitrust laws compel no such result under the circumstances here.

From a thorough examination of the purposes and effects of the practices involved, this Court concludes that Crown has shown a legitimate business purpose for the tie-in arrangements with its dealers whereby they are required to sell the antifreeze and vending machine products in question. These tying arrangements therefore do not unduly or unreasonably restrain trade under the

22. No claim has been made here by plaintiffs that any of these other restrictions violate the antitrust laws. It should be noted that these other restrictions are total prohibitions of the sale of other products, while those attacked here merely limit the products which may be sold.

23. This point was not disputed in the majority opinion.

Sherman Act. Miller Motors, Inc. v. Ford Motor Co., *supra*; Nelligan v. Ford Motor Co., *supra*; Crawford Transport Co. v. Chrysler Corp., *supra*.

#### (d) *Plaintiffs' Injuries*

■ To prevail in this case, plaintiffs have, under § 4 of the Clayton Act, the burden of proving that Crown's violations of the antitrust laws caused injury to their "business or property". 15 U.S.C. § 15. The plaintiffs' burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by proof of *some* damage flowing from each antitrust violation, and inquiry beyond this minimum point goes only to the amount and not the fact of damage. Zenith Radio Corp. v. Hazeltine Research Corp., 395 U.S. 100, 114, n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); Advance Business Systems & Supply Co. v. SCM Corporation, *supra* at 63. It is enough that the illegality is shown to be a material cause of the injury, and a plaintiff thus need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4. Zenith Radio Corp. v. Hazeltine Research Corp., *supra* at 114, 89 S.Ct. 1562; Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 702, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). On the record in this case, plaintiffs have met their burden of establishing a direct causal connection between the antitrust violations that have been found and injuries suffered by them.[24]

■ Had Crown not engaged in horizontal price-fixing with its competitors, the retail market in the Baltimore metropolitan area would not have been artificially stabilized. Increased competition would undoubtedly have led to lower retail prices and in turn to lower wholesale prices charged by Crown to plaintiffs. As buyers, the plaintiffs are entitled to damages if defendant as the seller charged them an illegal price, even though they may have passed on the overcharge to their customers. Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 483–494, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968).

■ Plaintiffs also suffered injury when they were prohibited from raising their retail prices by Crown's illegal vertical agreements. Their property was diminished by their inability to raise prices when they chose to do so, and each plaintiff thus suffered injury. Indeed, the fact that an illegal price-fixing agreement existed over a period of time may itself be proof of damage. *See* Fox West Coast Theatres Corp. v. Paradise Theatre Building Corp., 264 F.2d 602, 608 (9th Cir. 1958).

For like reasons, each plaintiff suffered injury when Crown fixed the resale price of motor oils sold at his station and when Crown prohibited the sale of other motor oils. Each plaintiff was prevented by Crown's illegal tying agreement as to motor oil from selecting for sale another high-quality motor oil which might have greater market acceptance than Crown's product. The amount of the damages to be awarded because of this illegal tie-in must await proof of lost sales. Advance Business Systems & Supply Co. v. SCM Corporation, *supra* at 69–70.

Equally clear is that the lease of each plaintiff was not renewed because each plaintiff refused to comply with illegal coercive pressures of Crown. Obviously, non-renewal of his lease would cause substantial direct harm to each plaintiff's business and property. Plaintiffs Tumminello, Freitag and Phillips were not renewed because of their insistence that they determine their own retail prices of gasoline and because they otherwise objected to illegal restrictions imposed by Crown. Plaintiff Myers was not renewed because he objected to provisions in Crown's new Lease and Dealer Agreement which this Court has now held to be illegal.

---

24. The amount of damages will be determined in later proceedings.

Crown's contention that all four of the plaintiffs were not renewed because they were unsatisfactory dealers is not supported by the evidence. Until they began to assert their independence, the plaintiffs were known to be good dealers, as they had been able to maintain their sales at continuing high levels.[25] When they began to object to Crown's illegal practices, plaintiffs suddenly began to receive unsatisfactory inspection reports. The evidence shows that the enforcement of Crown's operating standards through the use of inspection reports was uneven. On occasion, District Manager Gillespie himself changed ratings made by station supervisors from "good" to "unacceptable". The deficiencies relied upon by Crown were either contrived by its representatives to serve the Company's coercive ends or were minor in nature. The fact that some of these minor deficiencies might have contributed to Crown's decision not to renew the plaintiffs' leases would not defeat plaintiffs' claims here, since Crown's illegal motive substantially contributed to such decision. Osborn v. Sinclair Refining Company, 286 F.2d at 837.

## CONCLUSIONS OF LAW

1. Defendant Crown has violated Section 1 of the Sherman Act by combining with competitors horizontally in the fixing of the retail prices of gasoline in the Baltimore metropolitan area.

2. Defendant Crown has violated Section 1 of the Sherman Act by entering into illegal vertical agreements with plaintiffs fixing the retail prices of gasoline in the Baltimore metropolitan area.

3. Defendant Crown has violated Section 1 of the Sherman Act by entering into illegal tying agreements with plaintiffs relating to the sale of Crown motor oils in the Baltimore metropolitan area.

4. Defendant Crown has not violated Section 1 of the Sherman Act by restricting plaintiffs in the sale of antifreeze and in the sale of cigarettes, candy and soda through vending machines.

5. Plaintiffs have suffered damage pursuant to Section 4 of the Clayton Act as a result of Crown's horizontal price-fixing, vertical price-fixing and illegal tying agreements as to motor oil.

## RELIEF

For the reasons stated, each plaintiff is entitled to an injunction which would require the renewal of his lease under Crown's new Lease and Dealer Agreement as modified pursuant to this Opinion. Plaintiffs are also entitled to damages, attorneys' fees and costs as determined after further proceedings. Counsel should submit an appropriate Order, prepared in accordance with the findings and conclusions contained herein.

---

25. Indeed, Myers was recognized by Crown as a satisfactory dealer as late as May 1973, when he was offered a new one-year Lease. Only after he complained about coercive pricing provisions in the new Lease did Crown suddenly conclude that he was unsatisfactory.